IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

THE MANUFACTURERS LIFE
INSURANCE COMPANY (U.S.A.)                                    PLAINTIFF

VS.                        CIVIL ACTION NO. 5:04-cv-291(DCB)(JCS)

LISA A. SWINNY                          DEFENDANT/COUNTER-CLAIMANT

VS.

THE MANUFACTURERS LIFE
INSURANCE COMPANY (U.S.A.)                          COUNTER-DEFENDANT


MEMORANDUM OPINION AND ORDER

This cause is before the Court on the following motions:

(1) plaintiff/counter-defendant Manufacturers Life Insurance Company (U.S.A.)("Manulife")'s motion for summary judgment **(docket entry 48);**

(2) Manulife's motion to strike defendant's expert Brent Meador, M.D. **(docket entry 46);**

(3) Manulife's motion to strike amended death certificate and testimony of James Lee **(docket entry 50);**

(4) Manulife's motion to strike affidavit of Brent Meador, M.D. **(Docket entry 59);**

(5) defendant/counter-claimant Lisa A. Swinny ("Ms. Swinny")'s motion to strike plaintiff's reply memorandum regarding its motion to exclude expert **(docket entry 67);**

(6) Ms. Swinny's motion to strike plaintiff's reply and reply memorandum in support of its motion to strike affidavit of Brent Meador, M.D., or, alternatively, for opportunity to respond to new argument contained in reply and reply memorandum **(docket entry 76).**

Having carefully considered the motions and responses, the memoranda and the applicable law, the Court finds as follows:

Effective May 3, 2001, Manulife issued life insurance policy

number 56061377 ("the policy") on the life of Lee Dabney Swinny
("Mr. Swinny") in the face amount of $500,000.  The policy
provides:

> If the life insured dies by suicide within two (2) years
> after the issue date, whether sane or insane, we will pay
> only the sum of the premiums paid.

On the afternoon of December 5, 2002, Mr. Swinny was found on the
floor of his hotel room at the Ramada Hilltop in Natchez,
Mississippi.  Mr. Swinny was an accountant/bookkeeper for the
hotel, which was operated by the Swinny family.  Mr. Swinny was
living in the hotel during the period of separation from his wife,
Lisa A. Swinny ("Ms. Swinny"), the defendant.  Ms. Swinny, as
beneficiary of the life insurance policy, made a claim for the face
amount of the policy.  After an investigation, Manulife determined
that Mr. Swinny's death was a suicide, tendered a refund of
premiums paid, and notified Ms. Swinny of termination of the
policy.  Manulife also filed this suit seeking a declaration that
Mr. Swinny committed suicide; that he did so within two years from
the date the policy was issued; that the suicide provision of the
policy is valid and applicable; that the termination of the policy
was proper; and that Manulife is not liable to Ms. Swinny for
payment of the face amount of the policy.  Ms. Swinny has filed a
counterclaim on the premise that the cause of Mr. Swinny's death
was accidental, not suicide.

Manulife now seeks summary judgment on its declaratory

2

judgment action and Ms. Swinny's counterclaim, claiming that the evidence of Mr. Swinny's suicide is overwhelming and beyond credible dispute.  In response, Ms. Swinny offers evidence which she contends demonstrates a genuine issue of material fact.

Rule 56 of the Federal Rules of Civil Procedure states in relevant part that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c).  The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Moore v. Mississippi Valley State Univ., 871 F.2d 545, 549 (5th Cir. 1989); Washington v. Armstrong World Indus., 839 F.2d 1121, 1122 (5th Cir. 1988).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The movant need not,

3

however, support the motion with materials that negate the opponent's claim. Id. As to issues on which the non-moving party has the burden of proof at trial, the moving party need only point to portions of the record that demonstrate an absence of evidence to support the non-moving party's claim. Id. at 323-24. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id. at 324.

In Life & Casualty Ins. Co. of Tennessee v. Andrews, 149 Miss. 306, 115 So. 548 (Miss. 1928), the Mississippi Supreme Court announced the following rule:

> The presumption of law is against suicide, but such presumption is not conclusive; it is only prima facie; it may be overcome by the evidence. In order, however, to justify the court in taking the issue of suicide, or not, from the jury, and directing a verdict in favor of suicide, the evidence going to establish suicide must be so strong as that no other reasonable inference can be drawn therefrom than that of suicide. If the evidence is such, although it is without conflict, that two reasonable inferences can be drawn therefrom, one in favor of suicide and the other against, then, plainly, it is a question for the jury. On the other hand, if only one reasonable inference can be drawn from the evidence and that is suicide, then there is no question for the jury; there is only a question of law for the court.

Id., 115 So. at 551.

In Jefferson Standard Life Ins. Co. V. Jefcoats, 164 Miss. 659, 143 So. 842 (Miss. 1932), the insured was killed when he was struck by a train. The beneficiary of the life insurance policy sued the insurance company to recover under the policy, which

contained a limitation on recovery for suicide to premiums paid, if
the suicide occurred within two years from the date of the policy.
The insurance company argued that the cause of death was suicide.
The Mississippi Supreme Court held that the burden of proof was on
the insurance company "to establish, by a preponderance of the
evidence, that the deceased came to his death by his own volition,
or, in other words, that he was a suicide; that he could not have
placed himself in the position described, with his face toward the
on-coming train, on the cross-ties, so near to the rails on which
the train was moving, ignored the train signals, etc., with any
other intention than that of destroying himself by allowing the
rapidly moving train to strike him; that there was no other
reasonable hypothesis than that of intentional self-destruction,
conceding that the presumption is that no man intentionally
destroys himself, and that the [beneficiary] had the benefit of
this presumption throughout the entire case." Id., 143 So. at 843-
44. The court further held:

> We are of the opinion that the circuit judge should
> have submitted these facts to a jury for their
> determination, for, while the facts are not controverted,
> still reasonable men might draw different inferences from
> the state of facts herein detailed. These circumstances
> do not point unerringly to either of the theories so that
> it could be said as a matter of law, by the court, that
> the facts did or did not establish a case of suicide.
> Many authorities are cited wherein courts have held that
> the facts in the particular case establish suicide in a
> case similar to the one at bar; but we must observe that
> in all these cases, in addition to the circumstances
> immediately surrounding the death of the insured, there
> appear motives for the suicide. In the case at bar, we

> have no glimpse of the past history of the deceased.  We
> must assume he was happy, possessed of no melancholia, in
> no kind of trouble, either fancied or real, and that he
> was happily situated in his domestic relations.

Id. at 844.

In New York Life Ins., Co. V. Wood, 182 Miss. 233, 180 So. 819 (Miss. 1938), at issue was a double indemnity clause, allowing for double recovery if the insured died from "external, violent and accidental cause," and excluding from the double indemnity provision death from self-destruction.  The burden of proof was therefore on the deceased insured's beneficiary to prove death by external, violent and accidental means.  The insurance company's defense was that the insured had committed suicide by taking an overdose of bromidia.

The evidence showed without conflict that the insured's death was caused by an overdose of bromidia.  However, the Mississippi Supreme Court noted that the beneficiary's burden was "aided by the presumption against suicide."  Id., 180 So. at 820 (citing Jefcoats, 164 Miss. 659, 143 So. 842).  The beneficiary was required to show that the death was accidental, i.e., "undesigned, unintended, unexpected, and unpremeditated."  Id.  The court cited the following example:

> "If a man jump [sic] from a four-story window to the
> pavement below, deliberately intending to do so, this is
> no accident but is suicide, and is not covered by an
> accident policy.  But if the same person had intended to
> look out from the window, and, in approaching it, tripped
> over some object on the floor and was thereby thrown out
> of the window, this would be an accident, although the

6

party was negligent in not seeing the object over which
he tripped."

Id. (quoting <u>North American Accident Ins. Co. v. Henderson</u>, 180
Miss. 395, 177 So. 528, 529 (Miss. 1937).  The court then cited
examples dealing with the consumption of lethal substances:

> Death from an excessive does [<u>sic</u>] of medicine
> prescribed by a physician taken without the intention of
> self-destruction is a death from "external, violent and
> accidental means" within the terms of such a policy.
> <u>Dezell v. Fidelity & Casualty Co.</u>, 176 Mo. 253, 75 S.W.
> 1102.  "That a physician voluntarily attempts to inhale
> chloroform for headache and insomnia does not prevent
> recovery on an accident insurance policy for his death,
> due to his accidentally taking an overdose of the
> remedy." <u>Brown v. Continental Casualty Co.</u>, 161 La. 229,
> 108 So. 464, 45 A.L.R. 1521.  Nor does death from taking
> poison by mistake prevent a recovery on such a policy.
> <u>Healy v. Mutual Accident Association</u>, 133 Ill. 556, 25
> N.E. 52, 9 L.R.A. 371, 23 Am.St.Rep. 637.

Id.  In finding that the evidence was sufficient to present to the
jury the issue of whether the death was accidental or a suicide,
the court noted that "[t]here was no evidence of a threat of
suicide, or anything else tending to show such a purpose."  Id. at
821.

In contrast to <u>Jefcoats</u> and <u>Wood</u>, the case at bar does present
evidence of suicide and suicidal tendencies on the part of Mr.
Swinny.  On the floor next to Mr. Swinny was a spiral notebook
which contained a handwritten note dated December 5, 2002, at 1:54
a.m.:  "I have taken a whole bottle of each of the following:
Unisom, Tylenol PM, and Extra-Strength Tylenol.  I'm checking out
of the heart-break hotel.  My neck is hurting now as I write this."

(Notebook).  The notebook also contained entries dating back to November 12, 2002, in which Mr. Swinny indicated that, at times, he wished to die and/or commit suicide, including details of how he could do so.  (Notebook).  For example, Mr. Swinny wrote on Monday, November 25, 2002, that he "almost committed suicide today. Thought all morning how I could not live without her and ways to end it.  Pistol in mouth, sleeping pills.  If I had a hunting accident ..." (Notebook, unnumbered p. 5).  He also stated on November 28, 2002, that "I cannot live without her.  But I have to survive for my kids." (Notebook, unnumbered p. 8).  Scott Swinny, Mr. Swinny's bother, testified that he was with his brother the night of December 4, 2002, when Mr. Swinny was served with a divorce complaint and a temporary restraining order, approximately four hours before the final note in his notebook was written. (Deposition of Scott Swinny, p. 61).  Scott Swinny also testified that his brother "got real depressed when he actually got those papers." (Id. at 62).

Although Ms. Swinny declined to have an autopsy performed on Mr. Swinny's body, a toxicology analysis was performed on samples of Mr. Swinny's cardiac blood.  The toxicological analysis of the specimens revealed the presence in Mr. Swinny's bloodstream of (1) Acetaminophen (Tylenol), (2) Diphenhydramine (the generic name for Benadryl, and active ingredient in Tylenol PM), (3) Zaleplon (Sonata, a sleep aid), and (4) trace amounts of two drugs known as

Selective Serotonin Re-uptake Inhibitors (SSRIs).  The SSRIs that
were present in the bloodstream were Citalopram (Lexapro) and
Paroxetine (Paxil).  According to the toxicology report, there was
a lethal dose of Diphenhydramine in Mr. Swinny's bloodstream at the
time of his death.  (Toxicology Report).  According to Manulife's
expert toxicologist, Rick Carlton, M.D., Mr. Swinny died of an
overdose of Diphenhydramine, as well as from the addictive effects
of the several medications taken by Mr. Swinny immediately before
his death.  (Deposition of R. Carlton, M.D., p. 94).

    In responding to Manulife's motion for summary judgment, Ms.
Swinny presents her medical expert Dr. Brent Meador's report which
states, inter alia:

> Based on my review of the records, just prior to his
> death Mr. Swinny had Lexapro, an SSRI antidepressant,
> discontinued and Paxil, another SSRI antidepressant, was
> started as antidepressant medication.  "SSRI" is an
> abbreviation for selective serotonin reuptake inhibitor –
> which describes the manner in which this type of
> antidepressant medication works on the level of serotonin
> produced in the brain.  This type drug regulates or
> affects the levels of serotonin.  Two or more SSRI's
> should not be taken together.  When a patient has been
> taking one SSRI, before starting another SSRI, he or she
> should be tapered off the first and enough time should be
> allowed to transpire before the second is started to
> ensure that the first is fully out of one's system.
>
> ... Mr. Swinny was allowed to discontinue one SSRI
> (Lexapro) and immediately start another SSRI (Paxil),
> only a couple of days prior to his death.  This did not
> allow for a sufficient amount of time for the Lexapro to
> be fully out of his system before he started taking the
> Paxil.  Serotonin syndrome can be caused by a combination
> of SSRI's.  The mere combination can cause or produce
> this syndrome, and the amount of each drug is not
> determinative.

It is my opinion to a reasonable degree of medical probability that at the time of his death Mr. Swinny was fatally affected by serotonin syndrome, which can occur shortly after these types of medications (SSRI) are adjusted, i.e., one agent discontinued and the other started.  This syndrome is characterized by altered mental status (confusion, delirium) and multiple physiological abnormalities that could result in death.

It is my opinion, based on the facts of this case, upon review of medical literature and clinical experience, to a reasonable medical probability, that Mr. Swinny was delusional and confused at the time of his death due to the combination of his medications.  It is also my opinion, to a reasonable degree of medical probability, that just prior to and at the time of his death, Mr. Swinny was suffering from the effects of serotonin syndrome which precipitated his death.

In addition to altered mental status, serotonin syndrome can be lethal – it can cause coma, respiratory arrest, cardiac arrhythmia and death.  It is my opinion to a reasonable degree of medical probability that Mr. Swinny's death was due to respiratory arrest caused by serotonin syndrome.  It is also my opinion to a reasonable degree of medical probability that, while Mr. Swinny had an overdose on acetaminophen and Benadryl (diphenhydramine) which were present in excessive amounts in his system, these over-the-counter medications did not result in his death in the short period from the time of ingestion to the time of death.  The acetaminophen overdose would have a delayed hepatic effect over a number of days, not hours.  Further, the amount of Benadryl ingested was at the lower limit of a fatal dosage range, and based on Mr. Swinny's weight/size I would expect that its effect would be nothing more serious that [sic] to put him in a deep sleep.  Likewise, the level of Unisom (Zaleplon) was not fatal.

(Report of Brent Meador, M.D., pp. 1–2).  Dr. Meador concludes that Mr. Swinny's "death was due to the ingestion of the two SSRI drugs, which can only be considered accidental."  (Id. at 3).

Manulife has filed a motion to exclude Dr. Meador as an expert witness because he is not qualified, he did not apply the accepted

10

scientific diagnostic methodology, and his opinion will not be helpful to the trier of fact. (Motion to Exclude Expert, pp. 1-2). Because Manulife's motion is made pursuant to Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993), the Court shall address the motion to exclude prior to considering the motion for summary judgment. See Meadours v. Ermel, Slip Copy, 2005 WL 1923596 (S.D. Tex. August 10, 2005).

In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court held that district courts may apply the Daubert analysis to determine the reliability of experts generally:

> Daubert's general holding – setting forth the trial judge's general "gatekeeping" obligation – applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. We also conclude that a trial court may consider one or more of the more specific factors that Daubert mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in Daubert, the test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case.

Id. at 141-42. (citation omitted)

The Fifth Circuit has specifically held that Daubert applies to medical experts. Black v. Food Lion, Inc., 171 F.3d 308, 310 (5th Cir. 1999) (stating that Kumho supports the Fifth Circuit en banc decision in Moore v. Ashland Chemical, Inc., 151 F.3d 269 (5th Cir. 1998), that the Daubert analysis governs expert medical testimony). In Daubert and Kumho, the Court listed specific factors that a trial judge may consider when determining the

admissibility of expert testimony.   Those factors are:

> (1) Whether a "theory or technique ... can be (and has been) tested";
>
> (2) Whether it "has been subjected to peer review and publication";
>
> (3) Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
>
> (4) Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

Kumho, 526 U.S. at 149-50 (quoting Daubert, 509 U.S. at 592-94). The goal of Daubert is to "ensure the reliability and relevancy of expert testimony." Id. at 152.   The Daubert inquiry is a flexible one, however, and these factors "do not constitute a 'definitive checklist or test.'"   Id. at 150 (quoting Daubert, 509 U.S. at 593).

The Court finds that it is necessary to hold a Daubert hearing in order to determine whether Dr. Meador's expert testimony satisfies the Federal Rules of Evidence for admissibility.   Ms. Swinny must demonstrate that Dr. Meador's findings and conclusions are reliable, but need not show that his findings and conclusions are correct.   Bocanegra v. Vicmar Services, Inc., 320 F.3d 581, 585 (5th Cir. 2003).   The question to be resolved by the Court is whether Dr. Meador's testimony regarding the cause of Mr. Swinny's death is reliable and relevant under Daubert and Kumho's standards in order to allow the testimony to go before the jury.   Id.   The

Court's role is that of a gate-keeper only, limited to determining admissibility, not credibility, of the evidence.  Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002).

Immediately following the Daubert hearing, the Court will hold a hearing on the motion for summary judgment and other remaining motions.  However, the Court finds that Ms. Swinny's motion for leave to respond to new argument contained in Manulife's reply and reply memorandum in support of its motion to strike affidavit of Dr. Meador shall be granted.  Accordingly,

IT IS HEREBY ORDERED that Ms. Swinny's motion for leave to respond to new argument contained in Manulife's reply and reply memorandum in support of its motion to strike affidavit of Dr. Meador **(docket entry 76)** is GRANTED, and said response shall be due five (5) days from the date of entry of this Memorandum Opinion and Order;

FURTHER ORDERED that the parties shall contact the Court for the scheduling of the Daubert hearing, and hearing on remaining motions.  While witnesses are required for the Daubert hearing, the use of live testimony for the remaining motions is not required unless the parties request it.  The parties shall exchange witness and exhibit lists and furnish same to the Court at least ten (10) days prior to the hearing date.

SO ORDERED, this the  9th  day of January, 2006.

13

_____s/ David Bramlette_____
UNITED STATES DISTRICT JUDGE